## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and<br>INTELLECTUAL VENTURES II LLC, | ) | Civil Action No. 1:14-cv-00220-MRH |
| | ) | |
| | ) | FILING IN LEAD CASE |
| Plaintiffs, | ) | |
| | ) | **Reply Brief** |
| v. | ) | **Supporting Old Republic's** |
| | ) | **Motion to Dismiss (ECF 31)** |
| ERIE FAMILY LIFE INSURANCE COMPANY; | ) | |
| ERIE INDEMNITY COMPANY; | ) | Time: 9:30 a.m. |
| ERIE INSURANCE COMPANY; | ) | Date: February 5, 2015 |
| ERIE INSURANCE EXCHANGE; | ) | Place: Courtroom No. 6A |
| ERIE INSURANCE PROPERTY & CASUALTY | ) | |
| COMPANY; and | ) | The Honorable Mark D. Hornak |
| FLAGSHIP CITY INSURANCE COMPANY, | ) | |
| | ) | ELECTRONICALLY FILED |
| Defendants. | ) | |

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and<br>INTELLECTUAL VENTURES II LLC, | ) | Civil Action No. 2:14-cv-01131-MRH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HIGHMARK INC.; | ) | |
| HM INSURANCE GROUP, INC.; | ) | |
| HM LIFE INSURANCE COMPANY; | ) | |
| HIGHMARK CASUALTY INSURANCE | ) | |
| COMPANY; and | ) | |
| HM CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

INTELLECTUAL VENTURES I LLC and )
INTELLECTUAL VENTURES II LLC,        )        Civil Action No. 2:14-cv-01130-MRH
                                                      )
            Plaintiffs,                             )
                                                      )
               v.                                    )
                                                      )
OLD REPUBLIC GENERAL               )
INSURANCE GROUP, INC.;              )
OLD REPUBLIC INSURANCE COMPANY;  )
OLD REPUBLIC TITLE                       )
INSURANCE GROUP, INC.; and        )
OLD REPUBLIC NATIONAL TITLE       )
INSURANCE COMPANY,                   )
                                                      )
            Defendants.                           )

---

**Reply Brief
Supporting Old Republic's Motion to Dismiss
Because the Patents Don't Claim Patent-Eligible Subject Matter (ECF 31)**

# <u>TABLE OF CONTENTS</u>

**Page**

I.    Introduction and summary of argument...................................................................1

II.   Argument .................................................................................................................3

    A.   The correct law ............................................................................................3

        1.   *Alice's* two-step methodology controls the analysis of patent-eligibility; the opposition wholly failed to apply it......................................3

        2.   The opposition applied only the machine-or-transformation test, which is neither necessary nor sufficient ......................................................4

    B.   None of the patents are directed to patent-eligible subject matter .........................4

        1.   *Alice* step one: having asked the wrong question, the opposition necessarily obtained the wrong answer.........................................................4

        2.   *Alice* step two: *Ultramercial III,* issued after Old Republic filed its motion, confirms that none of the three patents add sufficient inventive concepts to be significantly more than the abstract idea.............7

        3.   The opposition couldn't distinguish the other post-*Alice* case law.............9

        4.   *DDR Holdings*, the object of IV's supplemental brief, didn't create patent-eligibility; to the contrary, that case confirmed its absence...........10

    C.   The opposition's various straw men didn't help resolve the substantive issues ........................................................................................................14

        1.   Old Republic didn't argue that software and related patents are *per se* patent-ineligible ..................................................................................14

        2.   Even if the machine-or-transformation test had applied, the patents each fail it...............................................................................................15

        3.   Old Republic presented its motion using the clear-and-convincing evidence standard..................................................................................16

    D.   The opposition's efforts to delay a decision on the merits failed .........................17

III.  Conclusion ..............................................................................................................18

    Appendix 1.............................................................................................................A1

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    134 S.Ct. 2347 (2014) ................................................................................... *passim*

*Bancorp Servs., LLC v. Sun Life Assurance Co of Canada.,*
    687 F.3d 1266 (Fed. Cir. 2012) ............................................................................17

*Bilski v. Kappos,*
    130 S.Ct. 3218 (2010) ....................................................................................4, 17

*BuySafe, Inc. v. Google Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014) ............................................................................10

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.,*
    2014 WL 923280 (E.D. Tex. Jan. 21, 2014) ........................................................10

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    2014 WL 6845152 (Fed. Cir. Dec. 5, 2014) ................................................. *passim*

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.,*
    758 F.3d 1344 (Fed. Cir. 2014) ........................................................................9, 10

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    132 S.Ct. 1289 (2012) ......................................................................................3, 5

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S.Ct. 2238 (2011) ..........................................................................................16

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ................................................................... *passim*

*Ultramercial, Inc. v. Hulu, LLC,*
    722 F.3d 1335 (Fed. Cir. 2013),
    *cert. granted, vacated, and remanded* 134 S. Ct. 2870 (2014) .........................4, 6, 8

*Ultramercial, LLC v. Hulu, LLC,*
    657 F.3d 1323 (Fed. Cir. 2011), *vacated* 132 S.Ct. 2431 (2012) .....................4, 5, 8

## I.   Introduction and summary of argument

The three software patents in this case shouldn't have issued if they claim abstract ideas. Do they? They've never been judged against the proper patent-eligibility test. The PTO assessed them more than a decade ago—under a test that the Federal Circuit later found to be, as it put it, inadequate and insufficient. The Supreme Court established the proper two-part patent-eligibility test for software patents in its mid-2014 decision, *Alice v. CLS Bank.*

The opposition applied the wrong test. These patents fail the right one. Read as a whole, each patent claims an abstract idea, and thus isn't patent-eligible under *Alice's* first step. Each of the patents also fails *Alice's* second step, because: each patent's specification states that it can be implemented using general-purpose computer technology; many of the steps were conventional and well-known outside of the computer context and the patents merely apply those concepts to computers; and the claim limitations' details don't change the patents' abstract nature.

The opposition cited *Alice*, but failed to apply it. Instead, its sole criterion to assess patent-eligibility was the Federal Circuit's machine-or-transformation test ("MOT test"). The Supreme Court specifically cautioned before *Alice* that the MOT test may not be appropriate as the sole criterion to assess the patent-eligibility of software patents, and didn't even mention it in *Alice*. The Federal Circuit instructed after *Alice* that it is *improper* to assess patent-eligibility using only the MOT. But that's the only test the opposition used. In any event, a patent fails the MOT test if the patent can be implemented using conventional technology. Each of these patents says that conventional technology will do.

The Federal Circuit's *Ultramercial III* opinion, issued since Old Republic filed its motion, confirmed that none of these patents are patent-eligible. Like the patents here, it involved software patents with an abstract idea at each patent's heart. As here, those patents involved an abstract idea. As here, those patents involved intricate and complex computer

1

programming, required specific application to a specific computer environment, and involved a complex computer interface. In the Federal Circuit's prior two opinions, it had upheld the patent-eligibility of the patent claims because of those details. But after *Alice*, the circuit unanimously concluded the patents failed its two-part analysis—rejecting the circuit's the reasoning and results. The opposition sought to create patent-eligibility using the very same kind of rejected reasoning. Its invitation would appropriately be declined.

In the main, the opposition tried to avoid the merits. It argued that patent-eligibility can't be decided on a 12(b)(6) motion. *Ultramercial III* did so. The opposition urged that absent the parties' agreement, its patents couldn't be assessed on the basis of representative claims. *Ultramercial III* did exactly that. The opposition contended that declaring these patents to be patent-ineligible must be delayed until this Court's construction of disputed claim terms (if any) and thus until summary judgment or even perhaps trial; the opposition isn't clear. *Ultramercial III* declared lack of patent-eligibility without claim construction. In any event, the opposition failed to identify *disputed* claim terms—not a single one. IV can't avoid judgment now by conjuring a phantom future dispute.

The opposition also employed the misdirection of straw men. It argued at length that *Alice* didn't make all software patents patent-ineligible. True enough—but *Alice* made *these* patents patent-ineligible. It argued that the PTO has allowed software patents since *Alice*. Also true—and irrelevant. *Alice* didn't create a *per se* rule against software patents. That the PTO has declined to enforce a nonexistent rule doesn't point towards the result that IV seeks.

Justice delayed, the maxim reminds, is justice denied. Patent-eligibility is a question of law, and it is ripe for decision now. Old Republic respectfully asks the Court to issue what *Alice* and its progeny require: a judgment that these patents don't claim patent-eligible subject matter.

## II.   Argument

### A.   The correct law

#### 1.   *Alice's* two-step methodology controls the analysis of patent-eligibility; the opposition wholly failed to apply it

The opposition applied the wrong patent-eligibility test, so it's helpful to quote the correct test in full. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014), established it:

> [we have] set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and *abstract ideas* from those that claim patent-eligible applications of those concepts. ***First***, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. *If so*, we then ask, '[w]hat else is there in the claims before us?' To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application. We have described step two of this analysis as a search for an '"inventive concept'" — i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'

*Alice*, 134 S.Ct. at 2355 (emphasis supplied).[1]

Apparently to support IV's unspoken notion that the PTO's ten-year-old decision to grant the patents based on a disapproved standard is beyond this Court's ability to question, the opposition theorized that *Alice* was "simply the Court's most recent decision in this area," not a change in patent-eligibility law for software and related patents. ECF 52 at 8. That's simply wrong, as is perhaps best demonstrated by *Alice's* effects on the *Ultramercial* software patents. Before *Alice*, the Federal Circuit twice affirmed patent-eligibility based on pre-*Alice* tests; after *Alice*, the circuit unanimously reached the opposite conclusion based on *Alice*'s new standard. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014) ("*Ultramercial III*")

---

[1] The Supreme Court established this two-part framework in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289 (2012), a biotechnology patent case. *Alice* extended that test to software and related patents, as both the PTO and the Federal Circuit have recognized. All emphasis in this brief is supplied unless otherwise noted. "ECF X" refers to the ECF number on this case's original docket, Case No. Civil Action No. 2:14-cv-01130-MRH.

(recounting the three Federal Circuit opinions).[2] The opposition likewise omitted that *Alice*

caused the PTO to change its standards for examining software patents, ECF 32 at Ex. 1-2

(PTO's changed guidance), and that the PTO's Patent Trials and Appeals Board has concluded

that a pre-*Alice* judicial determination of patent-eligibility receives no weight when assessing

that patent against *Alice.* ECF 32 Ex. 3.

> ### 2.     The opposition applied only the machine-or-transformation test, which is neither necessary nor sufficient

The opposition cited *Alice*, ECF 52 at 9, but wholly failed to apply it. Instead, its

sole criterion for assessing patent-eligibility was the Federal Circuit's MOT test. *Id*. at 15

('581 patent), 18 ('434 patent), & 20 ('002 patent). The Court cautioned before *Alice* that

it was dubious whether the MOT test should be the sole criterion for determining

patentability of Information Age patents. *Bilski v. Kappos*, 130 S.Ct. 3218, 3227 (2010).

*Alice* didn't even mention that test, let alone apply it. Since *Alice*, the Federal Circuit has

emphasized that satisfying the MOT test can't, by itself, render a claim patent-eligible.

*DDR Holdings, LLC v. Hotels.com, L.P.*, 2014 WL 6845152, at *9 (Fed. Cir. Dec. 5,

2014). The opposition omits that law. We thus turn to the merits, using the correct test.

> ## B.     None of the patents are directed to patent-eligible subject matter

> ### 1.     *Alice* step one: having asked the wrong question, the opposition necessarily obtained the wrong answer

The first step in a proper patent-eligibility analysis is to determine whether the patent is

directed to an abstract idea. *Alice*, 134 S.Ct. at 2355. The first step doesn't involve the minutiae

of the patents' claims. Rather, one looks to the patent *as a whole* and to the "idea at the heart" of

---

[2] *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323 (Fed. Cir. 2011), *vacated* 132 S.Ct. 2431 (2012) ("*Ultramercial I*"); *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013), *cert. granted, vacated, and remanded* 134 S. Ct. 2870 (2014) ("*Ultramercial II*"); and *Ultramercial III*, 772 F.3d 709 (Fed. Cir. 2014). For the Court's convenience, *Ultramercial's* complex representative claim is set forth in Appendix 1 hereto.

it. *Ultramercial III*, 772 F.3d at 714. Only in the second step does one "examine the limitations of the claims to determine whether the claims contain an 'inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." *Id.* at 715.

Using the MOT test as its sole criterion, the opposition didn't assess the claims as a whole. Instead, it argued that the "limitations are directed to computer technology—not an abstract idea." ECF 52 at 13. In effect, the opposition got the analysis that *Alice* requires backwards. In particular, the opposition theorized that:

- the '581 patent wasn't directed to an abstract idea because its claims include individual details such as networked resources ("client-server computer architecture"), computer technology that collects information ("discovery agent"), and a method to collect that information ("discovery rule"), ECF 52 at 14;

- the '434 patent wasn't directed to an abstract idea because its claims include details such as specific computer technology to search a database ("specific database search retrieval method and associated computer-readable media"), computer technology to create "a unique key," which serves as a proxy for the searched-for information and can be used to "search the database," *id*. at 17-18; and

- the '002 patent wasn't directed to an abstract idea because its claims involve "specific, concrete" computer technology (a "mobile device") to make user-specific resources available to that user both locally and remotely ("user information stored in a remote computer"), *id*. at 19.

That individual limitations contain computer technology details isn't relevant to *Alice*'s first analytical step. The Federal Circuit's three *Ultramercial* opinions underscore this.

The circuit's first opinion, decided well before *Alice*, concluded that the claims weren't directed to an abstract idea. It reasoned that inventions with specific applications or improvements to technologies in the marketplace are unlikely to be patent-ineligible and, in addition, that the claimed invention invoked computers and applications of computer technology. *Ultramercial I*, 657 F.3d at 1328. The Supreme Court vacated and remanded for further consideration based on *Mayo* (*see* n. 1, *supra*).

The circuit's second opinion, also pre-*Alice*, reached the same conclusion. It opined that

patent-eligibility was rife with underlying factual issues, *Ultramercial II*, 722 F.3d at 1339, must

be determined claim-by-claim, *id.* at 1340, that a tie to a computer is an important indication of

patent-eligibility, *id.* at 1348, and that in light of the patent claims' intricate and complex details,

it would wrench meaning from the word to label the claimed invention "abstract," *id.* at 1350.

The circuit also pointedly criticized the district court, which had granted a 12(b)(6) motion, on

the theory that "it was error for the district court to strip away these limitations and instead

imagine some 'core' of the invention.'" *Id.* at 1350. The concurring opinion presciently warned

that this second opinion should assess patent-eligibility based on *Mayo's* two-part test, "rather

than set forth our own independent views . . . ." *Id.* at 1354 (Lourie, J., dissenting). The Supreme

Court again vacated and remanded, this time in light of *Alice*.

In its third, final, and governing opinion, the circuit unanimously rejected the reasoning

and results of its two prior opinions. It didn't deem any factual issues to be present. It didn't

construe the claims. It assessed patent-eligibility on the basis of a representative claim.

*Ultramercial III*, 772 F.3d at 713-15. It rejected the argument that the claims were patent-eligible

because they were "directed to a specific method of advertising and content distribution that was

previously unknown and never employed on the Internet before." *Id.* at 714. Instead, in

accordance with *Alice's* first analytical step, in *Ultramercial III* the circuit looked beyond the

minutiae of the patent's claims for "the abstract idea at the heart of the . . . patent," *id.*,

notwithstanding its own prior criticisms of the district court that it was error to do so. In

*Ultramercial III*, the circuit concluded that the 11-step representative claim, *read as a whole*,

simply claimed an abstract idea. *Id.* at 714-15; *see also* Appendix 1 (that representative claim).

Notwithstanding the circuit's pronounced course-correction in *Ultramercial III*, the

opposition didn't try to determine whether there was an abstract idea at the heart of each patent.

Instead, it spent pages and pages discussing the finer points of each patent's limitations. ECF 52 at 14-15 (discussing specific limitations of the '581 patent), 17-18 (discussing specific limitations of the '434 patent) & 19-20 (discussing specific limitations of the '002 patent). For purposes of the first question of *Alice's* first question, none of that was on point. Having asked the wrong question, the opposition necessarily proffered the wrong answer.

The right answer is that each of the three patents is directed to an abstract idea: the '581 patent, to the abstract idea of using networked resources to make a decision based on collected information, ECF 31 at 6-9; the '434 patent, to the abstract idea of searching a database by searching for a combination of "tags" that serve as a proxy for the requested information, *id*. at 9-11; and the '002 patent, to the abstract idea of making user-specific resources available to a user both locally and at distant locations. *Id*. at 11-14.[3]

We thus turn to *Alice's* second step: whether the patents claims contain an inventive concept that adds significantly more to the abstract idea.

> **2.** **Alice step two: *Ultramercial III,* issued after Old Republic filed its motion, confirms that none of the three patents add sufficient inventive concepts to be significantly more than the abstract idea**

The opposition's task was to justify the patent-eligibility of the three patents in this case when judged against a standard (*Alice*) that hasn't ever been applied to them. When assessing the opposition's efforts, it's helpful to compare the reasoning in the two first *Ultramercial* opinions to the opposition's reasoning. One finds that the opposition employed the same kind of reasoning from the first two *Ultramercial* opinions that the circuit rejected in the third, and that the circuit

---

[3] In its effort to create patent-eligibility, IV posited a substantive difference between the description of the '581 patent's abstract idea by Old Republic ("using networked information to make a decision based on collected information") and the other two insurers that IV has sued ("collecting information about a device or its user"). ECF 52 at 12. There are, of course, many ways to describe an idea. Both descriptions are directed at the same core notion reflected in the '581 patent. One is "six of one," the other is "half a dozen." But there are still just six eggs.

has likewise rejected in other post-*Alice* cases.

The opposition defended the '581 patent on the theory that it uses "specific computer process[es]," "specific computer programs," and complex "specific processes to collect and manipulate data." ECF 52 at 14. The second *Ultramercial* opinion defended patent-eligibility on the theory that the patent claims required a "specific application of a method implemented by several computer systems, operating in tandem, over a communications network" and "complex computer programming." *Ultramercial II*, 722 F.3d at 1350.

The '434 patent, the opposition posited, survives *Alice* because it "is directed to a specific computer solution," with intricate and complex computer "architecture," and a "meaningful transformation of computer data." ECF 52 at 17-18. That echoes *Ultramercial I*'s defense of patent-eligibility on the theory that the patent claims "require specific application to the Internet," with "intricate and complex computer programming," and an "extensive computer interface." *Ultramercial I*, 657 F.3d at 1328.

Finally, the opposition sought to create patent-eligibility for the '002 patent because it's directed to "mobile interface software for a computer" and a "mobile device that can dynamically access user information stored in a remote computer," ECF 52 at 19, and the retrieval of particular information using that computer technology, *id*. That repeats *Ultramercial II*'s rejected patent-eligibility defense that "the invention involves an extensive computer interface," *Ultramercial II*, 722 F.3d at 1352, that allowed consumers "access to the associated media product" stored in a computer, *id*. at 1350.

*Alice* caused *Ultramercial III* to reject the reasoning and results of those two prior opinions.  Even leaving aside the circuit's complete about-face with respect to the reasoning and result in its two earlier opinions, *Ultramercial III* specifically rejected a variety of the arguments

that the opposition advanced to justify these patents. For example, the case confirmed that the use of a computer network "is not sufficient to save otherwise abstract claims from ineligibility," *Ultramercial III*, 772 F.3d at 716. The opposition tried to justify each of the patents on that rejected basis.[4] The case confirmed that "data-gathering steps" in a computer claim don't save an abstract claim from ineligibility. *Id*. The opposition tried to justify the '434 and '002 patents on that rejected basis.[5] The case corroborated that "adding a computer to otherwise conventional steps does not make an invention patent-eligible." *Id*. at 717. The opposition tried to justify the '581 patent on that rejected basis.[6] As a final example, the case affirmed that any transformation of data because of the use of computers or the transfer of content between computers doesn't create patent-eligibility, because that "is merely what computers do." *Id*. The opposition also tried to justify the '581 patent on that rejected basis.[7]

### 3. The opposition couldn't distinguish the other post-*Alice* case law

As Old Republic's opening brief explained, none of the Federal Circuit's then-extant post-*Alice* patent-eligibility opinions found the patents at issue to be patent-eligible. The opposition's efforts to distinguish those cases, as applied to the patents here, failed.

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc*., 758 F.3d 1344 (Fed. Cir. 2014), rendered the '581 patent patent-ineligible because the case confirmed that a process that employs

---

[4] ECF 52 at 14 (defending the '581 patent because it involved computer programs that communicated "across a communication link"), 17 (defending the '434 patent because it uses "a specific database search retrieval method") & 19 (defending the '002 patent because it can "dynamically access user information stored in a remote computer").

[5] ECF 52 at 17 (defending the '434 patent because it uses "metadata to optimize the database search process") & 19 (defending the '002 patent because it can "access user information stored in a remote computer").

[6] ECF 52 at 16 (defending the '581 patent on the theory that it "claims specific computer technology and, as a result, its claims are inextricably tied to a particular computer system").

[7] ECF 52 at 15 (defending the '581 patent on the theory that its "claims are tied to a networked computer system and, via the specific claimed software, transform a general purpose computer into a special purpose computer").

mathematical algorithms to manipulate existing information to generate additional information isn't patent eligible. *Id*. at 1351; ECF 31 at 7. The opposition suggested that *Digitech* isn't persuasive on the theory that it didn't require a physical device. ECF 52 at 15. But in patent-eligibility analysis, the presence or absence of a physical machine is beside the point. *DDR Holdings*, 2014 WL 6845152 at *9 (quoting *Alice*).

The opposition likewise sought to avoid the effects of *Alice* and of *BuySafe, Inc. v. Google Inc*., 765 F.3d 1350 (Fed. Cir. 2014), on the '581 and '434 patents on the theory that each of those cases involved use of a general-purpose computer. ECF 52 at 15-16 ('581 patent) & 18 ('434 patent). So do these two patents. The '581 patent states that the computer required for the patent "may be any type of computer, *including a general purpose computer,*" ECF 1-2 at 10:12-14, and the '434 patent states that it can be implemented with "a conventional computer," ECF 1-3 at 5:5-9, and "conventional computer systems," *id*. at 5:61-64. Where a claim can use a general-purpose computer, it necessarily fails the MOT test, *Ultramercial III*, 772 F.3d at 716-17—the only test the opposition applied.

Finally, the opposition sought to avoid the effects of *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 2014 WL 923280 (E.D. Tex. Jan. 21, 2014), on the '002 patent on the same basis: that it's directed to specific computer technology. ECF 52 at 20. Not so: the '002 patent says that "any computer" will do. ECF 1-3, Abstract. In short, the opposition didn't avoid (and couldn't have avoided) the effect of *Alice* and its progeny on these patents.

### 4. *DDR Holdings*, the object of IV's supplemental brief, didn't create patent-eligibility; to the contrary, that case confirmed its absence

*DDR Holdings, LLC v. Hotels.com, L.P.*, 2014 WL 6845152 (Fed. Cir. Dec. 5, 2014), is the only post-*Alice* Federal Circuit case whose *result* IV embraces. But its *rationale* doesn't help IV; quite the contrary, it points away from the result that IV seeks. Perhaps most fundamentally,

*DDR Holdings* applied *Alice's* required two-step analysis, *id.* at *8, which the opposition cited but failed to apply. Likewise, the case specifically noted that passing the MOT test can't create patent-eligibility by itself. *Id.* at *9. That was the only test the opposition applied. *Id.* at 15 ('581 patent argument), 18 ('434 patent argument), & 20 ('002 patent argument).

*DDR Holdings* also cut against IV's position in other ways. The case underscored that "after *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible patent claim patent-eligible." *DDR Holdings*, 2014 WL 6845152, at *9. But each of the patents states that it requires only generic computers. The '581 patent's required computer "may be any type of computer, *including a general purpose computer*," ECF 1-2 at 10:12-14. In the '434 patent, not only will a general-purpose computer suffice, the patent prefers one: "[a]n *exemplary* computer system for implementing the present invention includes a *conventional computer* . . . ," ECF 1-4 at 5:5-7. In the '002 patent, the mobile interface can be implemented and configured with "conventional" technology," ECF 1-3 at 6:1-6 and 6:45-48. *DDR Holdings* likewise emphasized that "the bare fact that a computer exists in the physical rather than the purely conceptual realm is 'beside the point.'" *DDR Holdings*, 2014 WL 6845752, at *9 (citing *Alice*, 134 S.Ct. at 2358). The opposition tried to justify the patents on this rejected ground—that they existed in the physical rather than conceptual realm.[8]

Likewise, *DDR Holdings* re-emphasized *Ultramercial III's* teachings that patent-eligibility isn't created from the mere facts that the specific technologies in the claims were previously unknown or novel and never before applied in that particular technological context. *DDR Holdings*, 772 F.3d at 714. That rejected approach is also how the opposition tried to create

---

[8] ECF 52 at 14 ('581 patent: "the claims are not directed to an abstract idea" because they involve "a computer system"); at 18 ('434: "the invention . . . employs inventive . . . data structures"); & 20 ('002 patent: "a physical machine . . . would thus be eligible for a patent").

patent-eligibility for these patents. *E.g.*, ECF 52 at 15 ('581: "a novel way to collect computer data") and 1 ('434: a "new to search and retrieve computing technology").

The 2-1 opinion in *DDR Holdings* reached a result that the opposition endorses for reasons that are missing here. The *DDR Holdings* patent was directed to "a problem that does not arise in the 'brick and mortar' context," *DDR Holdings*, 2014 WL 6845152 at *11, and the patent was thus "necessarily rooted in computer technology in order to overcome a problem *specifically arising in the realm of computer networks*." *Id.* at *10. Here, by contrast, the patents themselves indicate that they don't purport to solve problems that arise only in computer technology and aren't restricted to uses involving only computer technology that is new.

The '581 patent "relates to information collection systems," and more specifically to "a system for collecting information regarding a device or ***a user of a device***," ECF 1-2 at 1:12-15. Problems in that context included the need to collect information "while requiring minimal interaction with the user of the system," *id.* at 1:54-56, and that the systems "are not easily modified," *id.* at 1:34-35. Telephone "help" lines for all manner of electronic devices have faced these problems for decades, and indeed the patent specifically discusses "request[s] for assistance made to a technical support representative or sales representative," *id.* at 2:13-15.

The '434 patent "relates in general to locating information in a database, and more particularly to using an index that includes tags and metafiles to locate the desired information." ECF 1-4 at 1:24-27. Problems in that context included: searches that returned the wrong results, *id.* at 1:40-42, the need to focus a search so that only the most relevant information is returned, *id.* at 2:1-5, and the need for a "universal search vocabulary" so that multiple information repositories, i.e., databases, could be searched, *id.* at 2:16-26. The Library of Congress classification system had addressed those problems decades ago, ECF 32 at 10-11. Moreover, the

'434 patent explains that its method for searching a database could be used to search "a database of classified advertising information [or] consumer business information[,]" ECF 1-4 at 4:15–17, which isn't limited to the computer context; such compilations can be in paper form, such as The Yellow Pages, and can also be searchable by humans.

Likewise, the '002 patent explains that it is "directed to a mobile interface agent that can be used to dynamically access resources stored either locally . . . or across a network," ECF 1-3 at 1:9-11. The ability to access resources stored either locally (one's account balance, as maintained at and by one's local bank branch) or across a network (those same records, accessed while travelling) is a problem that ATMs addressed long ago. ECF 32 at 12-13.

In its analysis of *Alice*'s second step—an analysis that IV didn't conduct—the *DDR Holdings* court found a sufficient additional inventive concept only because the additional elements in the claim limitations weren't routine. 2014 WL 6845152, at *10-12. Here, by contrast, the opposition pointed only to routine technologies. Seeking to create patent-eligibility for the '581 patent, it sought support from the claimed use of a "computer processes, across a communication link in a computer system to collect information about the computer system," "a computer-readable medium" and "networked computer system." The '581 patent states that these elements were routine.[9] Trying to justify the '434 patent, the opposition invoked the use of a "database index," "parsing" of database requests, and XML "tags." Again, the patent describes all of those as conventional computer technology.[10] And seeking to save the '002 patent, the

---

[9] ECF 1-2 at 1:25-28 (referring to "[e]xisting procedures for collecting or retrieving information" using a "software application" or routine; *id.* at 5:19-21 (stating that communication link "can be any type of communication link using any type of communication medium"); *id.* at 10:15-48 (identifying general-purpose computer and computer-readable medium).

[10] ECF 1-4 at 1:33-38 & 4:52-5:49 (describing a conventional information retrieval system which parses requests, contains an index and searches a database to locate information, and explaining that more detail is "readily available in the appropriate programming manuals, users guides, and

opposition pointed to software that "can dynamically access user information stored in a remote computer," the use of "computer network structure," and "pointers." Once again, the patent impeached that argument, describing these as examples of conventional computer technology.[11]

In short, the opposition treated *DDR Holdings* as a departure from the Supreme Court's teachings in *Alice* and the Federal Circuit's teachings in *Ultramercial III*. Leaving aside that the opposition doesn't explain why it's appropriate to ask this Court to ignore the Supreme Court's teachings, the hard truth for IV is that *DDR Holdings* doesn't change *Alice* or make new law. Instead, *DDR Holdings* simply applied *Alice* to a new set of circumstances: addressing a problem that arose only in the realm of computer networks by creating a new solution rooted solely in computer technology that is more than well-understood, routine, or conventional. *DDR Holdings*, *supra*, at *10-11. By contrast, and as just explained, these patents addressed problems that existed in other contexts for years, and offered solutions that used computer technology—but even then, only sometimes; and in any event, all of which was conventional and routine, as the patents themselves described it.

### C. The opposition's various straw men didn't help resolve the substantive issues

#### 1. Old Republic didn't argue that software and related patents are *per se* patent-ineligible

Marbled throughout the opposition were several notions, developed at some length, that address arguments Old Republic didn't make: straw men, apparently there to distract. The opposition urged repeatedly that *Alice* didn't create a per se rule against software patents, e.g.,

---

similar publications"); *id.* at 8:67-9:4 (explaining that XML and XML tags are defined by a standard maintained by the World Wide Web Consortium).

[11] ECF 1-3 at 1:34-36 (explaining that a "user interface in an OS generally includes 'pointers' to software programs, applications, files, folders, documents, and the like"); *see id.* at 2:12-17 (explaining that "[c]omputers in many environments are connected to a network," and that "[c]omputers on the network can conveniently manage and access software programs, applications, files, folders, documents, and the like from another computer or server").

ECF 52 at 8-10, and pointed out that the PTO has issued software patents after *Alice*, *id*. at 9. But Old Republic hasn't argued that *Alice* created a *per se* prohibition against software patents. The PTO's allowance of software patents after *Alice* says nothing about whether *these* patents, issued more than ten years ago based on a disapproved patent-eligibility standard, were patent-eligible.

>2. **Even if the machine-or-transformation test had applied, the patents each fail it**

The opposition also found fault in Old Republic's analytical methodology, which assessed patent-eligibility based on *Alice*, all of the Federal Circuit's extant post-*Alice* opinions, and numerous post-*Alice* district court opinions. The opening brief didn't, however, apply the Federal Circuit's MOT test. The opposition criticized that absence. ECF 52 at 15, 18, and 20.[12]

As explained above, a patent-eligibility analysis that omits the MOT test is in good company. The Supreme Court has previously cautioned against using it to assess software and related patents. *Alice*, which invalidated the method, computer system, and computer-readable media claims of four U.S. patents, didn't use that test—or even mention it. After *Alice* the Federal Circuit has emphasized that satisfying the MOT test isn't sufficient by itself to render a claim patent-eligible. *See* §II(A)(2), *supra*. Given that law, the opposition's criticism left no mark.

In any event, these patents' method claims don't satisfy this different test. As *Ultramercial III* explained, where a claimed method can use a general-purpose computer, that method necessarily fails the MOT test. *Ultramercial III*, 772 F.3d at 716-17. Here, each of these patents proclaims that the claimed methods can be implemented using a general-purpose computer. In the '581 patent, the computer "may be any type of computer, *including a general*

---

[12] Under that test, a claim can be patent-eligible if (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.

*purpose computer,*" ECF 1-2 at 10:12-14. In the '434 patent, "[a]n *exemplary* computer system

for implementing the present invention includes a *conventional computer . . . ,*" ECF 1-4 at 5:5-

7. In the '002 patent, the mobile interface can be implemented and configured with

"conventional" technology," ECF 1-3 at 6:1-6 and 6:45-48.

Citing a lower court decision from a decade before *Alice*, the opposition's response to

these statements in its patents was to argue that the MOT test is satisfied when a general-purpose

computer executes an instruction or exchanges information. ECF 52 at 15. Whether that ever

accurately stated the law, after *Alice*, it doesn't: "Any transformation from the use of computers

or the transfer of content between computers is merely what computers do and does not change

the analysis." *Ultramercial III*, 772 F.3d at 717 (analyzing *Alice*).

### 3.   Old Republic presented its motion using the clear-and-convincing evidence standard

The opposition also spent three pages on an effort to manufacture a dispute about whether

Old Republic has presented its arguments under the "clear and convincing" standard. ECF 52 at

5-7. Old Republic's opening brief specifically stated that it presented its arguments as if the clear

and convincing standard applied, ECF 31 at 6 n.3, and this reply likewise presents its arguments

as if that standard applied.[13]

---

[13] That said, if the Court wishes to reach the issue of whether the clear and convincing standard *should* apply, perhaps in an alternative grounds for decision, it could. Judge Mayer's concurrence in *Ultramercial III* explains without objection from the majority that the standard doesn't apply. *Ultramercial III*, 772 F.3d at 717, 720-22. Moreover, to apply the standard isn't logical: patent-eligibility is ultimately a question of law, subject to *de novo* review, thus there are no "facts" to apply the standard to; the Supreme Court has never mentioned the standard in any patent-eligibility case; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2251 (2011), held that the standard is more easily met when the PTO didn't have the correct information, from which it follows that the standard shouldn't apply at all if the PTO asked the wrong question; and Justice Breyer has specifically observed that the standard doesn't apply to questions of law. ECF 31 at 6 n.3. But again, the Court needn't reach this interesting issue to decide this motion.

**D.     The opposition's efforts to delay a decision on the merits failed**

Lacking traction on the merits, the opposition argued at length that the Court shouldn't reach them. ECF 52 at 1-14. It suggested that patent-eligibility can't be decided on the pleadings, *id*. at 13-14, but the Federal Circuit unanimously did just that in *Ultramercial III*, 772 F.3d at 712-13. The law likewise rejects the opposition's theory that declaring these patents to be patent-ineligible must be delayed until claim construction. *Ultramercial III*, 772 F.3d at 712, found patent claims to be patent-ineligible without requiring claim construction, and the Federal Circuit has likewise previously found "no flaw" in that approach. *Bancorp Servs., LLC v. Sun Life Assurance Co of Canada.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). Indeed, in *Bancorp*, the circuit confirmed patent-ineligibility despite the parties' *actual* disputes about claim terms that the district court had declined to resolve. *Id*. at 1273-1274. Here, by contrast, no such disputes exist: IV identified none, and it proffered no specific constructions. It can hardly avoid judgment now by suggesting that unspecified phantom disputes might someday emerge.

Likewise without purchase was the opposition's argument that lack of patent-eligibility requires this court (and, on IV's appeal, the Federal Circuit and perhaps the Supreme Court) to assess every single claim of every single patent. In some cases the parties agree to such an approach. ECF 52 at 11. But they don't need to. In *Ultramercial III*, for example, the Federal Circuit found all 16 claims of the patent at issue (2 independent and 14 independent) to be patent-ineligible, with no indication that the parties agreed to a representative claim. *Ultramercial III*, 772 F.3d at 711-12 (invalidating U.S. Patent No. 7,346,545). The circuit treated claim 1 as representative and concluded that the remaining 15 claims "need not be considered further." *Id*. at 712.

\

\

## III.       Conclusion

Not one of these patents is patent-eligible. Each of them claims an abstract idea without a sufficient further inventive concept. *Alice*, which the opposition failed to apply, makes this clear. *Ultramercial*, which the opposition also failed to apply, makes this clear. Even the sole post-*Alice* case that the opposition invoked, *DDR Holdings*, makes this clear.

Patent-eligibility is a question of law, and it is ripe for decision now. Old Republic respectfully asks that the Court issue what *Alice* and its progeny requires: a judgment that these patents don't claim patent-eligible subject matter.

Dated: December 19, 2014                                Respectfully submitted,


  *s/ Vernon M. Winters*     
Vernon M. Winters

| | |
|---|---|
| *Arthur H. Stroyd, Jr.* | *Vernon M. Winters (Pro Hac Vice)* |
| *PA ID No. 15910* | *CA ID No. 130128* |
| *Justin T. Romano* | ***Sidley Austin LLP*** |
| *PA ID No. 307879* | *555 California Street, Suite 2000* |
| ***Del Sole Cavanaugh Stroyd LLC*** | *San Francisco, CA 94014* |
| *The Waterfront Building* | *(415) 772-1200* |
| *200 First Avenue, Suite 300* | *vwinters@sidley.com* |
| *Pittsburgh, PA 15222* | |
| *(412) 261-2393* | *Russell E. Cass (Pro Hac Vice)* |
| *astroyd@dscslaw.com* | *IL ID No. 9624437* |
| *jromano@dscslaw.com* | ***Sidley Austin LLP*** |
| | *One South Dearborn* |
| | *Chicago, IL 60603* |
| | *(312) 853-2202* |
| | *rcass@sidley.com* |

**Appendix 1**
**(The representative claim from *Ultramercial*)**

A method for distribution of products over the Internet via a facilitator, said method comprising the steps of:

a first step of receiving, from a content provider, media products that are covered by intellectual property rights protection and are available for purchase, wherein each said media product being comprised of at least one of text data, music data, and video data;

a second step of selecting a sponsor message to be associated with the media product, said sponsor message being selected from a plurality of sponsor messages, said second step including accessing an activity log to verify that the total number of times which the sponsor message has been previously presented is less than the number of transaction cycles contracted by the sponsor of the sponsor message;

a third step of providing the media product for sale at an Internet website;

a fourth step of restricting general public access to said media product;

a fifth step of offering to a consumer access to the media product without charge to the consumer on the precondition that the consumer views the sponsor message;

a sixth step of receiving from the consumer a request to view the sponsor message, wherein the consumer submits said request in response to being offered access to the media product;

a seventh step of, in response to receiving the request from the consumer, facilitating the display of a sponsor message to the consumer;

an eighth step of, if the sponsor message is not an interactive message, allowing said consumer access to said media product after aid step of facilitating the display of said sponsor message;

a ninth step of, if the sponsor message is an interactive message, presenting at least one query to the consumer and allowing said consumer access to said media product after receiving a response to said at least one query;

a tenth step of recording the transaction event to the activity log, said tenth step including updating the total number of times the sponsor message has been presented; and

an eleventh step of receiving payment from the sponsor of the sponsor message displayed.

A1