IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INTELLECTUAL VENTURES I LLC, )
*et al.*, )
)
Plaintiffs, ) Civil Action No. 2:14-cv-220
)
v. ) Judge Mark R. Hornak
)
ERIE INDEMNITY COMPANY, *et al.*, )
)
Defendants. )

## OPINION

**Mark R. Hornak, United States District Judge**

Before the Court is a Motion to Dismiss infringement claims as to the last of several patents at issue in this case. ECF No. 132. The Motion argues that this patent, U.S. Patent 7,757,298 (the "'298 Patent") is not drawn to patent-eligible subject matter under 35 U.S.C. § 101. The Plaintiff patent holders disagree and the parties have fully briefed the issue. ECF Nos. 133, 134, 135. The Erie Defendants also brought some supplemental authority to the Court's attention, ECF Nos. 138, 140, about which the Court also heard from the Plaintiffs, ECF Nos. 139, 141. With that excellent briefing, the Court will dispense with oral argument and decide the matter on the papers.

For the reasons stated in this Opinion, the Court concludes that the '298 Patent is drawn to patent-ineligible subject matter and does not clear the *Alice* bar. Therefore, the Erie Defendants' Motion to Dismiss will be granted.

## I. BACKGROUND

### a. Earlier Litigation & The Court's First Opinion

By Order of the Court, three related patent infringement cases filed by Plaintiffs Intellectual Ventures I and Intellectual Ventures II LLC ("Intellectual Ventures") were consolidated. ECF No. 50. At issue were four patents held by Intellectual Ventures: U.S. Patent Nos. 6,519,581; 6,510,434; 6,546,002; and the '298 Patent. The various Defendants moved to dismiss the infringement claims against them on § 101 grounds. After full briefing and argument, the Court granted the Motions to Dismiss as to the '581 Patent,[1] the '434 Patent, and the '002 Patent, finding each to be drawn to patent-ineligible subject matter. *Intellectual Ventures I LLC, et al. v. Erie Indem. Co.*, 134 F. Supp. 3d 877, 926 (W.D. Pa. 2015) ("*Erie I*").

That Opinion did not substantively address the '298 Patent because it was not subject to any then-pending Motion to Dismiss. *Id.* at 881 n.8. When the initial Motions to Dismiss were filed, the '298 Patent was subject to invalidity proceedings before the Patent Trial and Appeal Board ("PTAB"). ECF No. 46-1, at 1 n.2. The PTAB declined to initiate an *inter partes* review proceeding against the '298 Patent on 35 U.S.C. §§ 102 or 103 grounds. *See Int'l Bus. Mach. Corp. v. Intellectual Ventures I LLC*, IPR2014-01516 (P.T.A.B. Aug. 24, 2015). Now that that has all been cleared up, the Defendants filed this Motion to Dismiss and the matter is ripe for disposition.

### b. The '298 Patent

The '298 Patent is titled "Method and Apparatus for Identifying and Characterizing Errant Electronic Files" and is designed to solve the problem of the proliferation of illicit files on

---

[1] More specifically, the Court dismissed the claims as to the '581 Patent for want of subject matter jurisdiction but held in the alternative that if it *had* subject matter jurisdiction, the Court would grant the Motions to Dismiss on patent-ineligibility grounds. *Erie I*, 134 F. Supp. 3d at 926.

the Internet (like pornography, pirated music or software, etc.). '298 Patent col. 4 ll. 30–34, 47–52 (filed June 3, 2005). Claim 1 is representative:

> 1. A computer-implemented method for identifying and characterizing stored electronic files, said method comprising:
>
> under control of one or more configured computer systems:
>
> selecting a file from a plurality of files stored in a computer storage medium, wherein selecting the file is performed according to at least one of:
>
>> selecting the file based on the size of the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold;
>>
>> selecting the file based on whether content of the file matches a file type indicated by a name of the file; or
>>
>> selecting the file based on whether the file comprises data beyond an end of data marker for the file;
>
> generating an identification value associated with the selected file, wherein the identification value is representative of at least a portion of the content of the selected file;
>
> comparing the generated identification value to one or more identification values associated with one or more of a plurality of unauthorized files; and
>
> characterizing the file as an unauthorized file if the identification value matches one of the plurality of identification values associated with the unauthorized files.

'298 Patent col. 12 ll. 21–44 (Claim 1).

In non-patentspeak, the claim can be boiled down to four fundamental steps: (1) selecting a file; (2) generating a unique value corresponding to the file; (3) comparing that unique value to a bunch of previously generated values that correspond to different types of illicit files; and (4) marking the file for deletion or other treatment if its assigned value matches a known one. '298 Patent col. 2 ll. 58–65.

3

The invention purports to "reliably characterize files according to pre-set criteria, that is not easily circumvented, and that reduces the amount of manual review necessary to verify proper operation."[2] '298 Patent col. 2 ll. 42–44. It recognizes various characteristics of files—like being split into parts, illegitimate files appended to legitimate ones, and names that give away illegal, illicit, or offensive content (readers can imagine such names for themselves)—and in so doing, saves Web hosting services from criminal, copyright, or some other liability.

## II. **LEGAL STANDARDS**

### a. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of cases that fail to state a claim upon which relief can be granted. Complaints must allege facts "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In assessing a motion to dismiss, courts must accept all "well-pleaded facts as true" and disregard any legal conclusions. *Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 556 U.S. at 677).

A "plausible claim for relief" in a patent infringement case necessarily requires a valid patent; otherwise there can be no infringement. And "[w]hether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010). Thus, the 12(b)(6) stage is a proper one at which to examine patent eligibility under § 101.

---

[2] Such manual review, Intellectual Ventures notes, is "usually not *economically* feasible, and is also not entirely effective at identifying undesirable files." '298 Patent col. 1 ll. 61–64. Notably, with its reference to *reducing* the amount of manual review, the '298 Patent presupposes the existence of manual review, and the ongoing use of manual review. *Id.* col. 2 ll. 38–44. More on that later.

4

### b. *Alice* & § 101: The Law

In general, patents may be granted to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof . . . ." 35 U.S.C. § 101. But there are three categories of exceptions to that broad sweep including "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). It is the "abstract ideas" category with which we are concerned here.

Patent eligibility under § 101 is governed by the two-step framework set out by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (describing "the longstanding rule that an idea of itself is not patentable."). In step one, courts must determine whether the claims at issue are "directed to a patent-ineligible concept." *Id.* Abstract ideas are things like "preexisting, fundamental truth[s]" (like mathematical equations), "method[s] of organizing human activity," or "longstanding commercial practice[s]" (like intermediated settlement or risk hedging). *Id.* at 2356. "[A] relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *TLI Comms. LLC v. AV Automotive, L.L.C.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). But courts must not oversimplify claims because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S. Ct. at 2354 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). In essence, *Alice* step one prompts courts to ask, what are the claims generally trying to achieve? *See Erie I*, 134 F. Supp. 3d at 897–98.

If the claims are directed to a patent-ineligible concept, courts proceed to step two and look for an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to

5

ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1298). "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI*, 823 F.3d at 613. Therefore, the claims must contain more than merely stating an abstract idea and adding the words "apply it." *Alice*, 134 S. Ct. at 2357. Appending "well-understood, routine, conventional activity" won't do, nor will "the mere recitation of a generic computer." *Id.* at 2358–59. At *Alice* step two, the machine-or-transformation test can be a "useful clue" as to patent-eligibility.[3] *See Bancorp Servs. LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). That test asks whether claims are "tied to a particular machine or apparatus" or "transform[] a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008). In so doing, to make a claim patent-eligible, "the use of the machine must impose meaningful limits on the claim's scope," *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011), and "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly," *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332–33 (Fed. Cir. 2010).

The standard is clear enough, but its application is another matter. In recognizing that courts should "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases," *Enfish*, 822 F.3d at 1334, this Court examined the state of § 101 jurisprudence in its first Opinion. *See Erie I*, 134 F. Supp. 3d at 895–907 (collecting cases). The Court will spare the parties another extended canvas of the law, but will discuss a handful of especially relevant recent decisions.

---

[3] Importantly, the machine-or-transformation test "is not the sole test" for whether an invention is patent-eligible. *Bilski v. Kappos*, 561 U.S. 593, 604 (2010).

Supplementing the guidance found in cases discussed by this Court in *Erie I*, *see* 134 F. Supp. 3d at 902–07, the Federal Circuit has recently decided several more § 101 cases. For example, in *Enfish*, the Federal Circuit confronted patents that passed muster under *Alice*. *See* 822 F.3d 1327. There, the court found that patents dealing with a "self-referential" database were not directed to an abstract idea. *Id.* at 1336. Instead, the patents were directed to "an innovative logical model for a computer database . . . [*i.e.*,] a model of data for a computer database explaining how the various elements of information are related to one another." *Id.* at 1330. The improvements to a unique computer operation—the self-referential table—grounded the idea in non-abstractness and went beyond generic "storing, organizing, and retrieving memory in a logical table." *Id.* at 1337. In so holding, the Federal Circuit took care to distinguish the patents at issue from others that only added the use of conventional computer components to well-known business practices or mathematical formulae. *Id.* at 1338–39 (collecting cases).

And in *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, No. 2015-1763, 2016 WL 3514158 (Fed. Cir. June 27, 2016), the Federal Circuit encountered another patent that contained a sufficiently "inventive concept" to satisfy *Alice* step two. The claims at issue generally recited a system for filtering Internet content. *Id.* at *6. And although the court held that "filtering content" is an abstract idea at *Alice* step one, the patent contained an "inventive concept" when considering the ordered combination of limitations. *Id.* at *15. That inventive concept is "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* Rather than reciting "the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components" the claims combined the benefits of two

existing, unique content filters in a way that "improve[d] an existing technological process." *Id.* at *15–16.

But in *TLI*, 823 F.3d at 609, the Federal Circuit held that a patent which related "generally to an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device" was directed to "the abstract idea of classifying and storing digital images in an organized manner and fail[ed] to add an inventive concept sufficient to confer patent eligibility." Limitations in the patent to tangible components merely "provide[d] a generic environment in which to carry out the abstract idea." *Id.* at 611.

This Court should, and will, also draw from the wisdom of other district courts around the country. The Defendants rely heavily on *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371 (D. Del. 2015). Appropriately so, in the Court's view. Chief Judge Stark's thorough and well-reasoned opinion invalidated on § 101 grounds another of Intellectual Ventures' patents: U.S. Patent No. 6,460,050 (the "'050 Patent") entitled "Distributed content identification system." The *Symantec* court found that the claims were directed to "receiving information related to a file (an identifier) from a querying computer, characterizing the file based on the identifier and other stored identifiers, and communicating a result of the characterization back to a querying computer." *Id.* at 383. Analogizing to the claims in *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014), the court went on to conclude that the '050 Patent was directed to the abstract idea of "receiving identity information, comparing it to other information, and communicating results based on the identifying information." *Symantec*, 100 F. Supp. 3d at 383.

Chief Judge Stark bolstered his conclusion that the claims were directed to an abstract idea by analyzing whether the steps of the claims could be performed by human beings in a non-computerized context. *Id.* Like "police officers looking for stolen cars or parking enforcement officers determining how many unpaid tickets belong to owners of illegally parked cars," the claim steps *could* be performed by humans wholly apart from any computer implementation. *Id.* at 384–85. And the *Symantec* court rejected the plaintiff's argument that the claims were saved based on the U.S. Patent and Trademark Office ("PTO") Interim Eligibility Guidelines. *Id.* at 385. Specifically, the court said that "[t]he PTO's hypothetical claim is directed to creating 'sanitized' versions of computer files by 'extracting, via file parsing, the malicious code' from computer files." *Id.* Thus, the Interim Guidelines example was "necessarily rooted in computer technology because malicious code or 'viruses' have no significance outside the realm of computer technology." *Id.*

Finally, under *Alice* step two, the court in *Symantec* found that "uniqueness" and "characterizing" limitations did not add a sufficiently inventive concept. *Id.* at 386–87. Instead, they amounted to "nothing more than a generic computer implementation of the human-executable abstract idea." *Id.* at 386. The court also rejected plaintiff's argument that under the machine-or-transformation test, specialized software or programming added an inventive concept because the claims themselves stated that *any* "hashing algorithm" or "any number of commercial or free e-mail systems, or other data transfer systems in [other] applications" could be used. *Id.* at 387.

In *Asghari-Kamrani, et al. v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2016 WL 3670804 (E.D.V.A July 5, 2016), the court invalidated a patent that "relates to a system and method provided by a Central-Entity for centralized identification and authentication of users

9

and their transactions to increase security in e-commerce." *Id.* at *2. The court concluded that the claims were directed to the abstract idea of "using a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction." *Id.* at *7. And the claims were not directed to a problem unique to computer network authentication because although party authentication "has been magnified by computer and network technology [that] does not make the problem unique to this environment." *Id.* at *10. The claims also failed *Alice* step two because they "have generic computers perform an old method of authentication." *Id.* at *12.

In *American Well Corp. v. Teladoc, Inc.*, No. 1:15-cv-12274, 2016 WL 3255011, at *2, *7 (D. Mass. June 13, 2016), the court concluded that a patent which "monitors, records, and extends services based on the 'present availability' of a medical care provider" was directed to the abstract idea of "connecting a patient with an available doctor." The claims did "not purport to improve the functioning of computer or internet technology itself, nor [did] they address an internet-centric challenge." *Id.* at *7. And at *Alice* step two, the court found no inventive concept because the claims merely implemented the abstract idea with generic and previously-known computer components. *Id.* Specifically, the court held that "accessing and storing information on a data repository, identifying medical service providers in a pool, sending and receiving communications over a computer, and using the Internet to do all of the above" did not make the abstract idea any less abstract. *Id.* (internal alterations and quotations omitted). And just because the claims "automate or otherwise make more efficient" traditional methods or techniques did not render them patent-eligible. *Id.* at *9 (citing *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015)).

In *Visual Memory LLC v. NVIDIA Corp.*, No. 1:15-cv-789, 2016 WL 3041847, at *5 (D. Del. May 27, 2016), the court concluded that a patent claiming a "computer memory system

10

connectable to a processor and having one or more programmable operational characteristics" was directed to the abstract idea of categorical data storage. Interpreting the Federal Circuit's recent decision in *Enfish*, the district court remarked that that decision is "best understood as a case which cautions against oversimplification during step one of *Mayo/Alice*, rather than a case which exempts from § 101 scrutiny all patents which purport to improve the functioning of a computer." *Id.* at *4. Thus, just because the claims touch on improvements to computer capabilities, they were still abstract in that they did not point to a specific or concrete improvement in the way software operates. *Id.* at *5. In considering *Alice* step two, and the Federal Circuit's decision in *DDR Holdings*, the *Visual Memory* court said that the "'rooted in computer technology' heuristic . . . is best understood as a clue that when a solution overcomes a problem specifically arising in a particular technological realm, that solution—though it may implement an abstract idea—may likely contain an inventive concept." *Id.* at *6 (internal alterations and quotations omitted). Thus, the court found that descriptions of generic web servers and attendant software were insufficiently inventive without some explanation of the specific mechanism with which the limitations are achieved. *Id.* at *7.

In *Activision Publishing, Inc. v. xTV Networks, Ltd. et al.*, No. 2:16-cv-737, at 1 (C.D. Cal. July 25, 2016), the court concluded that a patent entitled "Managing, Accessing, and Retrieving Networked Information Using Physical Objects Associated with the Networked Information" was directed to ineligible subject matter. The claims were drawn to the abstract idea of "using information stored in one place to determine the location of and retrieve information stored in a second place." *Id.* at 8. Moreover, the patent lacked an inventive concept because it only "simplifie[d] many aspects of data transfer among physically close individuals"

11

rather than improving the functioning of a computer itself or effecting an improvement in other technology. *Id.* at 14.

And most recently in *VideoShare, LLC v. Google, Inc.*, No. 13-cv-990, slip op. at 9 (D. Del. Aug. 2, 2016), the Court held that two software patents were directed to the abstract idea of "preparing a video in streaming video format for sharing over a computer network." The claims were *not* directed to any improvement in computer functionality largely because the specification did not recite any specific file format conversion software. *Id.* at 12. Indeed, the proprietary software disclosed in one of the patents was "built upon . . . third-party technologies" that provide the conversion technology; no specific algorithms or specific software code was claimed as part of the invention. *Id.* Moreover, the steps claimed in the patents could be performed manually by a human. *Id.* at 13. The court also found that the patents lacked any inventive concept because they "merely recite[d] conventional computer components or functions that involve the use of a computer network." *Id.* at 17.

It is with that background and understanding of the legal landscape that the Court turns to the analysis of the '298 Patent.

### III. ANALYSIS

#### a. Claim Construction

The Court will deal first with Intellectual Ventures' last arguments: namely that deciding patent-eligibility now is premature because the Court has not heard from experts and has not construed the claims. ECF No. 134, at 20–22. According to Intellectual Ventures, "understanding the software and its associated source code counsels towards allowing a fuller record with expert testimony." *Id.* at 20. Intellectual Ventures wants expert testimony to "explain[] the functionality of the source code [appended to the patent as an exemplary file identification application], . . .

12

what the code would teach a skilled artisan about how to implement the claimed functionality, . . . and whether that source code or the application it is embodied within was 'generic' when the '298 Patent was filed." *Id.* at 21.

That argument goes hand-in-hand with Intellectual Ventures' other procedural argument that claim construction is necessary for terms like "selecting," "generating," "comparing," and "characterizing." *Id.* Intellectual Ventures says that construction of those terms generates a genuine dispute about the basic character of the invention. *Id.* What Intellectual Ventures does not say, however, is why the Court cannot understand the claims terms from the face of the '298 Patent.

"The general rule is . . . that terms in the claim are to be given their ordinary and accustomed meaning." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). And indeed, it is not uncommon for "the ordinary meaning of claim language . . . [to be] readily apparent even to lay judges." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). That is the case here. Claim "construction" of the '298 Patent language would be "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims did "not require elaborate interpretation"). The Court is comfortable with its ability to give meaning to words like "selecting" and "comparing" without the assistance of expert testimony. *Cf. Barry v. Medtronic, Inc.*, No. 1:14-cv-104, at *4 (E.D. Tex. July 19, 2016) (declining expert testimony "in the field of retroactive mind reading of the thoughts of patent examiners" because it would not assist the trier of fact).

Declining to engage in claim construction or to hear from experts is also procedurally appropriate at this stage. *See O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d

1351, 1360 (Fed. Cir. 2008) (the Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings"); *Bancorp*, 687 F.3d at 1273 ("claim construction is not an inviolable prerequisite to a validity determination under § 101"); *Erie I*, 134 F. Supp. 3d at 908 ("claim construction is desirable, unless in reviewing the patents at issue, a district court concludes that it isn't.").

Therefore, the Court concludes that the "basic character" of the '298 Patent is evident when the claim terms are given their ordinary and accustomed meanings. Neither expert testimony nor claim construction is necessary to decide this Motion.

### b. *Alice* Step One Application

At *Alice* step one, Erie contends that the '298 Patent is directed to the abstract idea of "identifying and characterizing electronic files." ECF No. 133, at 12. Intellectual Ventures contends that it is not. ECF No. 134, at 13.

Erie analogizes to Chief Judge Stark's *Symantec* opinion, arguing that the '298 Patent's claims describe "using conventional computing technology to identify potentially suspect files using attributes indicative of illicit content, comparing each of the suspect files to a list of known unauthorized files, and characterizing a suspect file as 'unauthorized' it if matches a known unauthorized file." ECF No. 133, at 12. Intellectual Ventures counters that the claims are actually directed to "specific computer technology—a particular way to scan computer files on computer networks to identify unauthorized files based on certain digital attributes of the files." ECF No. 134, at 13. Further, Intellectual Ventures argues, the claims solve a problem unique to computer systems: "identifying unauthorized or malicious computer data that a user has hidden by modifying the attributes of computer files on the network" using a file identification application.

*Id.* Intellectual Ventures analogizes to the PTO's Interim Guidelines that say "isolating and removing malicious code from electronic messages" is not an abstract idea. *Id.* at 14.

The Court concludes that Erie has the better of the argument and that Chief Judge Stark's analysis applies here. The '298 Patent is directed to the abstract idea of identifying and categorizing files based on a set of predetermined criteria. Unlike the patent-eligible claims from *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014); *Enfish*, 822 F.3d 1327; and *BASCOM*, 2016 WL 3514158, the '298 Patent does not solve a computer-centric problem or a problem that is unique to computers. The '298 Patent does not deal with computer viruses or relational databases or anything "necessarily rooted in computer technology." Instead, it merely claims a computerized solution to a longstanding problem that exists outside of computers: identifying and categorizing illicit files, the possession of which might subject an individual or organization to liability. *See* '298 Patent col. 1 ll. 53–56. Intellectual Ventures' analogy to malicious computer code is inapt. It is true that the claims purport to use computer code to determine *if* a file is unauthorized based on the digital attributes of the file. But that computerization of the solution is not enough to prevent the underlying idea from being abstract. *See Erie I*, 134 F. Supp. 3d at 921 ("the fact that [manual processes] would be slower and less accurate does not change the analysis.") (citing *OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.")). Illicit files (even those stored on a computer or the Internet) exist wholly apart from their electronic presence—pornography and pirated music, for example could take many non-electronic forms even when they are stored electronically. Pictures can be printed and music can be listened to from a CD or cassette tape.

Indeed the functions performed by the '298 Patent could be performed by humans. *See Symantec*, 100 F. Supp. 3d at 383 ("[a]nother helpful way of assessing whether the claims . . . are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings") (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)). The '298 Patent itself admits as much. '298 Patent col. 1 ll. 57–59, col. 8 ll. 10–12 ("Such files can be selected for review and characterized as acceptable or unacceptable . . . using [a] . . . *manual* process") (emphasis added). While it may be time-intensive and laborious, files could be physically examined with set criteria and marked for disposition.[4]

Imagine a librarian tasked with marking and removing books containing pornographic material from a library. The librarian could select books to examine based on specific criteria. Perhaps books that are bigger or broken into volumes are more likely to contain such illicit material. Or the librarian could look for certain terms in the books' titles, or the name of a publisher. Or she could look for books that contain more pages of pictures than pages of words. All of these are set criteria that could be readily and mechanically employed, resulting in predictable, self-evident conclusions. The librarian could then mark those books with a red sticker, indicating they are to be removed. That is the process claimed in the '298 Patent, executed physically rather than on a computer.

---

[4] Of course the criteria doesn't necessarily have to be the same (digital attributes like whether a file is broken up), but it certainly could be (the name of the file, the size of the printout, etc.). The '298 Patent claims "at least one of" file size, whether the content of the file matches the file type or name of the file, and whether there is "data beyond an end of data marker for the file." '298 Patent col. 12 ll. 27–34. But those criteria have analog analogs. Physical "files" like books have sizes and names and can have "data" appended to them (*i.e.* a book with a CD attached to the back cover). So the '298 Patent does not claim criteria that are "necessarily rooted in computer technology."

So while malicious computer code and "viruses" and relational databases exist only because computers exist, illicit files do not (and they existed long before computers became ubiquitous[5]). Thus, the claimed process of identifying and categorizing them is an abstract idea.

### c. *Alice* Step Two Application

Having determined that the '298 Patent is directed to an abstract idea, the Court will look for an "inventive concept" at *Alice* step two. Erie argues that the '298 Patent lacks an inventive concept because it "merely uses . . . conventional [computer] components[6] for their basic functions: data collection, recognition, comparison, and storage (or deletion from storage)." ECF No. 133, at 15–16. Intellectual Ventures argues that there *is* an inventive concept because "each claim recites specific computer-implemented steps to identify and characterize electronic files" and because "[d]ependent claims further limit the scope to software that employs checksum-based implementations." ECF No. 134, at 16.

Intellectual Ventures' arguments, however, are misplaced. First, that the claims recite specific computer-implemented steps is not enough to supply an inventive concept. *See Alice*, 134 S. Ct. at 2357 ("The introduction of a computer into the claims does not alter the analysis. Neither [does] stating an abstract idea while adding the words 'apply it.'") (citing *Mayo*, 132 S. Ct. at 1294). The steps specified by Intellectual Ventures (selecting files based on file size, a mismatch between the content and file type, the existence of data beyond the end of a data marker within the file, and the match of a specific identification value; generating a specific identification value; and determining if that value matches another value) are generic functions,

---

[5] *See Stanley v. Georgia*, 394 U.S. 557, 568 (1969) ("We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime.").

[6] The components cited in the '298 Patent are: "configured computer systems," "a computer storage medium," "a server," "a memory," "a file identification application," "a network," and "a non-transitory computer-readable storage medium."

even if performed by a computer. *See id.* at 2359 ("conventional computer activities or routine data-gathering steps . . . are 'well-understood, routine, conventional activit[ies] previously known to the industry.'") (quoting *Mayo*, 132 S. Ct. at 1294); *see also buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Bancorp*, 687 F.3d at 1278 (a computer "employed only for its most basic function . . . does not impose meaningful limits on the scope of those claims."). Selecting files based on identifiers and matching different files/identifiers is just what computers do. There is nothing inventive about it.[7]

Second, the dependent claims—revolving around the appended sample source code—do not provide meaningful limitations. Those claims only specify the type of identification value ("checksum") generated, the type of files that might be selected, or the processing the files will undergo. *See* '298 Patent col. 12 ll. 45–67, col. 13–14. All are routine computer functions. And the appended source code does not save the claims either. *See id.* col. 9 ll. 10–11 ("There are numerous possible algorithms that may be utilized to generate a checksum."). Like in *VideoShare*, No. 13-cv-990, slip op. at 12, the '298 Patent does not claim the source code itself, but the process. The source code is exemplary and does not provide an inventive concept. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method."); '298 Patent col. 4 ll. 27–29 (indicating the source code is a "preferred embodiment of a file identification application"). Intellectual Ventures asserts nothing, except for the bald suggestion, that the software is novel. That is insufficient to provide an inventive concept.

---

[7] This conclusion is bolstered by the language of the '298 Patent itself. "The user computer 120 may be *any type of computing device* that allows a user to interactively browse websites." '298 Patent col. 3 ll. 44–48 (emphasis added).

Finally, Intellectual Ventures argues that the '298 Patent clears the *Alice* step two bar under the machine-or-transformation test. ECF No. 134, at 10. Specifically, Intellectual Ventures argues that the '298 Patent "provides for novel software—a technological improvement—that executes the claimed operations and creates a new machine as a result." *Id.* at 16. Erie counters that "[c]omputers have long been used to select files based on a variety of criteria, including size, name, and type, as well as to perform mathematical operations, and the '298 Patent does not purport to describe a new technology for performing such basic computing functions." ECF No. 135, at 7.

Of course, "the machine-or-transformation test, by itself, it not sufficient to render a claim patent-eligible, as not all transformations or machine implementations infuse an otherwise ineligible claim with an 'inventive concept,'" *DDR Holdings*, 773 F.3d at 1256, but it remains a "useful clue," *Bancorp*, 687 F.3d at 1278. Intellectual Ventures focuses on the PTO's allowance of the claims during prosecution, when it applied the machine-or-transformation test. ECF No. 134, at 11. But, that prosecution occurred pre-*Alice* so the PTO's reliance on that test is of limited value here. *See* ECF No. 134-4 (patent prosecution documents from 2005). Intellectual Ventures' arguments are further belied by the text of the '298 Patent itself which mentions "any type of computing device," a "simple file deletion program," and "numerous possible algorithms."[8] And as discussed above, the source code is not specifically claimed. Therefore, the Court concludes that the '298 Patent does not "somehow change or improve the computer itself." *See Erie I*, 134 F. Supp. 3d at 916. The abstract idea claimed in the '298 Patent is implemented

---

[8] Here too, "[p]reemption concerns are a central factor, as the second step is geared toward weeding out claims that would monopolize, or preempt, use of the abstract idea itself through artful drafting." *Erie I*, 134 F. Supp. 3d at 898 (citing *Alice*, 134 S. Ct. at 2357). Such broad claims run a real risk that the '298 Patent would preclude any attempt to design another system for identifying and categorizing potentially illicit files.

on a generic computer, is directed to patent-ineligible subject matter, and lacks an inventive concept.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the '298 Patent is directed to patent-ineligible subject matter. Therefore, Erie's Motion to Dismiss will be granted, and the Complaint will be dismissed with prejudice.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: August 4, 2016
cc: All counsel of record